UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TRAVIS JARRETT FRANTTI,

                Plaintiff,

       -v-                          1:16-CV-810

STATE OF NEW YORK, SUSAN
KNAPP, MARY BETH LABATE,
KAREN DAVIS, KAREN ORCUTT,
CHRISTOPHER AMADO, and
ROBERT MUJICA,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                     OF COUNSEL:

PETERSON, THOMAS LAW FIRM     THOMAS W. PETERSON, ESQ.
Attorneys for Plaintiff
49 Burlington Avenue
P.O. Box 578
Round Lake, NY 12151

HON. LETITIA JAMES            KEITH J. STARLIN, ESQ.
Attorney General of the State of New York  Ass't Attorney General
Attorneys for Defendants
The Capitol
Albany, NY 12224

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On July 5, 2016, plaintiff Travis Jarrett Frantti ("Frantti" or "plaintiff"), a former

employee of the State of New York ("New York State" or the "State"), filed this civil rights

action against defendants New York State and State employees Susan Knapp ("Knapp"),

Mary Beth LaBate ("LaBate"), Karen Davis ("Davis"), Karen Orcutt ("Orcutt"), Christopher Amado ("Amado"), and Robert Mujica ("Mujica") (collectively the "individual defendants").

Frantti asserted claims against New York State and the individual defendants (collectively "defendants") for disability discrimination under § 504 of the Rehabilitation Act (First Cause of Action), employment discrimination and retaliation under Titles I and V of the Americans with Disabilities Act ("ADA") (Second Cause of Action), and a claim for the denial of Equal Protection under 42 U.S.C. § 1983 (Third and Fourth Causes of Action).

On September 9, 2016, defendants moved under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) seeking partial dismissal of Frantti's civil rights complaint. In particular, defendants sought pre-answer dismissal of (1) the Rehabilitation Act claim against the individual defendants; (2) the ADA claims against the individual defendants *and* New York State; and (3) the third or fourth constitutional claim, since the two were arguably duplicative of each other.[1]

On March 8, 2017, a Memorandum–Decision & Order issued granting defendants' partial motion to dismiss, *Frantti v. State of N.Y.*, 2017 WL 922062 (N.D.N.Y. Mar. 8, 2017), except insofar as it concluded Frantti had alleged an official-capacity claim under the ADA for prospective injunctive relief; *i.e.*, the individual defendants' alleged failure to restore plaintiff to his prior job title. *Id*. at *5-*6 (concluding ADA's discrimination and retaliation provisions do not provide for individual liability and that such claims asserted against the State itself were barred by Eleventh Amendment immunity). Thereafter, plaintiff filed an amended complaint

---

[1] Plaintiff pleaded a free-standing claim for a violation of 42 U.S.C. § 1983 (Third Cause of Action) separately from a claim alleging the denial of his right to Equal Protection (Fourth Cause of Action). As defendants correctly argued in the motion to dismiss, a § 1983 claim cannot stand alone—it must be paired with the alleged violation of a constitutional right.

that conformed his remaining claims to the determinations set forth in this MDO. Dkt. Nos. 21, 22.

Consequently, the parties went to discovery on Frantti's (1) Rehabilitation Act claim against New York State; (2) ADA claim for prospective injunctive relief against the individual defendants in their official capacities; and (3) § 1983 claim alleging the denial of Equal Protection. *Frantti*, 2017 WL 922062, at *7.

On March 22, 2019, defendants moved under Rule 56 for summary judgment on Frantti's remaining claims. According to defendants, plaintiff cannot establish that he suffered from a qualifying disability for purposes of either the Rehabilitation Act or what remains of his ADA claim, but that even if he could do so, the accommodation or accommodations he apparently sought for that disability were totally unreasonable—in defendants' view, plaintiff wanted some kind of complete exemption from, *inter alia*, the job performance and attendance policies that were applicable to his fellow State employees.

The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. **BACKGROUND**[2]

In 1992, Frantti graduated from the University at Albany with a bachelor's degree in political science. Pl.'s Dep. Vol. 1, Dkt. No. 42-4, 50:23-51:3 ("Dep. Vol. 1"). After spending a gap year caring for his ill grandmother, plaintiff began graduate work at the University of

---

[2] Frantti failed to comply with Local Rule 7.1(a)(3), which among other things requires the party opposing summary judgment to file a response that mirrors the movant's statement of material facts. N.D.N.Y.L.R. 7.1(a)(3). The penalty for non-compliance with this mandate is clear: "The Court shall deem admitted any properly supported facts . . . that the opposing party does not specifically controvert" in this responsive filing. *Id.* Although this rule will be discussed and applied *infra* when analyzing whether plaintiff's claims should survive summary judgment, a significantly more detailed factual recitation is set forth here to assist the reader with better understanding this confusing dispute.

South Carolina. *Id*. at 51:4-13. Plaintiff went on to complete two years of study, but moved home before finishing up his master's thesis. *Id*. at 51:14-17.

Back home in New York, Frantti re-enrolled at the University at Albany, this time working toward a graduate degree in public administration. Dep. Vol. 1 at 51:18-23. In his second year, plaintiff interned with the New York State Division of the Budget ("DOB"), a government entity responsible for developing and executing the yearly budget adopted by the State's legislature. *Id*. at 51:23-52:2, 54:12-19, 58:5-18; *see also Our Mission*, NEW YORK STATE DIVISION OF THE BUDGET, https://www.ny.gov/agencies/division-budget (last visited Oct. 9, 2019).

### A. DOB Hires Frantti

In July of 1996, Frantti graduated with his master's degree and DOB hired him on full-time as a budget examiner in the Public Protection Unit ("PPU"). Dep. Vol. 1 at 58:4-11, 15-22; Frantti Aff., Dkt. No. 44-1, ¶¶ 16-17. PPU is the DOB unit responsible for "overseeing the budgets of general government and public protection agencies" like the Division of Criminal Justice Services ("DCJS"). Knapp Decl., Dkt. No. 42-27, ¶ 1.

DOB divides up work within the department by assigning its budget examiners with oversight responsibility for groupings of various State agencies, and in Frantti's case this initially included the Commission on Judicial Conduct, the Capitol Defender's Office, and the Departments of Banking and Insurance. Dep. Vol. 1 at 59:2-10. Thereafter, DOB promoted plaintiff to the title of senior budget examiner and, after he spent five or six good years in that position, to the title of associate budget examiner. *Id*. at 59:19-22, 60:1-4, 60:17-20; *see also* Frantti Aff. ¶¶ 18-22.

In 2004, DOB appointed Susan Knapp to the title of PPU Unit Chief ("PPU Unit Chief Knapp"), a position that included supervisory responsibility over Frantti and other budget examiners in the PPU. Frantti Aff. ¶¶ 18, 20. A few years later, still under PPU Unit Chief Knapp's supervision, DOB promoted plaintiff again, this time to Acting Section Head of the PPU. *Id*. ¶ 21. As Action Section Head, plaintiff assumed oversight responsibility for an additional set of New York State agencies. *Id*. Thereafter, PPU Unit Chief Knapp added to plaintiff's workload by adding another State agency to his list of responsibilities. *Id*. ¶ 22.

## B. Frantti Gets Promoted to Grade 31

In September of 2010, DOB promoted Frantti to the title of "principal fiscal policy analyst," a "non-competitive" salary Grade 31 position "in civil service terms." Dep. Vol. 1 at 61:15-62:7, 188:18-22. According to plaintiff, principal fiscal policy analyst is a "coveted" title that is "rarely employed" at DOB. Frantti ¶ 23.

This kind of "non-competitive" position gave DOB executive personnel the discretion to promote certain employees into a higher salary grade than they might otherwise be qualified for under the ordinary criteria set forth in the regular, "competitive" civil service system. Dep. Vol. 1 at 64:3-11. Coveted or not, though, a so-called "non-competitive" civil service position is an "at will" job that does not include any of the traditional civil service protections available to other State employees. Knapp Decl. ¶ 7.

The way Frantti ended up in this non-competitive Grade 31 position is a little complicated. As plaintiff explains, the general, competitive civil service track that aspiring DOB employees follow begins at the title of budget examiner, then advances through the titles of senior budget examiner, associate budget examiner, principal budget examiner, assistant unit chief, unit chief, deputy budget director, and is finally capped off at budget

director.  Dep. Vol. 1 at 63:20-64:3.

The process of advancing through this well-defined civil service track involves scoring well on a series of examinations that are administered periodically by the New York State Civil Service Commission.  Dep. Vol. 1 at 65:17-18.  These exams are broken up into a few different components, but the two that come up in this case are (1) a written test and evaluation, known by some employees as a "T&E"; and (2) a six-month review period called the Behavioral Performance Assessment Program, or "BPAP."  *Id*. at 65:17-66:6; Pl.'s Dep. Vol. 3, Dkt. No. 42-6, 52:17-18, 54:3-7 ("Dep. Vol. 3").

Frantti had not yet passed the Grade 31 civil service promotion exam when DOB elevated him to the non-competitive title of principal fiscal policy analyst.  Dep. Vol. 1 at 65:14-67:15; 63:13-19.  As plaintiff explains, he had taken the Grade 31 exam once before, but failed the T&E portion due to his admitted "arrogance" and "poor judgment."  *Id*. at 68:12-69:14; *see also* Knapp Decl. ¶ 6.

Luckily for Frantti, however, a principal budget examiner had left DOB and plaintiff had been given all of this former employee's work assignments in addition to his own.  Dep. Vol. 1 at 61:20-62:1; *see also* Frantti Aff. ¶¶ 23-24.  In plaintiff's understanding, the fact he was now doing the work of two people provided his supervisors with "justification" to promote him to the non-competitive Grade 31 title of principal fiscal policy analyst.  Dep. Vol. 1 at 62:18-23.  According to PPU Unit Chief Susan Knapp, she had recommended plaintiff for the promotion in the hopes that he would score well the next time he took the Grade 31 exam and become eligible for a regular, competitive position at DOB in the near future.  Knapp Decl. ¶ 7.

On November 29, 2010, still in his non-competitive placement, Frantti began the

process of re-taking the Grade 31 civil service exam. Knapp Decl. ¶ 15. Around this time, the Governor's Office also retooled DOB's tasks and responsibilities, shifting it away from policy work and toward the more mundane work of implementing technical transactional controls. *Id*. ¶ 9.

In PPU Unit Chief Knapp's opinion, the former was one of Frantti's strengths while the latter was an area of weakness, and as a result plaintiff's job performance began to suffer. Knapp Decl. ¶¶ 9-14. Plaintiff does not directly deny this general assertion about his job performance, but insists that he remained engaged in his work and always attended to this more technical part of his job with "diligence and care." Frantti Aff. ¶¶ 25-26.

On July 2, 2012, Frantti learned that he had passed the Grade 31 civil service exam. Dep. Vol. 1 at 69:19-70:14. However, he had scored relatively poorly. In fact, his civil service score put him at the bottom of the list of eligible employees, which meant his supervisors remained unable to promote him through the competitive civil service track. *Id*. at 70:14-18, 71:12-17; *see also* Knapp Decl. ¶ 15.

According to PPU Unit Chief Knapp, the New York State Civil Service Commission began at this time to pressure DOB and other State agencies to reduce their reliance on "non-competitive" positions like the one Frantti held at DOB. Knapp Decl. ¶ 16. This pressure made it "increasingly difficult to justify keeping plaintiff in his 'non-competitive' salary grade 31 position instead of returning plaintiff to his 'competitive' salary grade 27 [position]." *Id*.

Notably, Frantti continued to retain a "hold item" on his prior, competitive Grade 27 position. In civil service jargon, this "hold item" would allow plaintiff to eventually return to his prior salary grade and its accompanying civil service protections if he were ever removed

from the non-competitive Grade 31 job.  Knapp Decl. ¶ 8.

### C. Frantti Gets Sick

In July of 2012, Frantti and a group of his friends headed up to Oxbow Lake in the Adirondacks to do some fishing.  Dep. Vol. 1 at 48:7-13, 49:6-9.  Shortly after returning home from this vacation, plaintiff began to experience an onslaught of unpleasant, intermittent gastrointestinal problems that would last for the next eleven months.  Dep. Vol. 1 at 50:3-4, 112:6-19; *see also* Frantti Aff. ¶ 30.

The severity and precise combination of Frantti's symptoms varied by the day, but generally included lethargy, nausea, lack of appetite, unsteadiness, bilateral stomach pain, occasional vomiting, recurrent diarrhea, and uncontrollable sweating.  Dep. Vol. 1 at 113:5-116:21, 126:13-15, 127:23-129:8, 130:18-131:12.

Although these symptoms caused him to miss "a number of days" at the office when he returned to work in late July, Frantti did his best to continue life as normal while his doctors tried to figure out the root cause of his mysterious illness.  Frantti Aff. ¶¶ 3, 30.  In August, plaintiff received an offer to work DCJS, a different agency, on some special projects "associated with Alternative to Incarceration Programs."  Dep. Vol. 1 at 196:17-23.

The precise details of who made this offer to Frantti, and for what reasons, are in dispute.  *See* Frantti Aff. ¶ 29.  Plaintiff maintains that the offer came from Deputy Secretary of Public Safety Liz Glazer ("Deputy Secretary Glazer"), the person who "oversaw every criminal justice agency in the State of New York."  Dep. Vol. 1 at 212:10-14.

PPU Unit Chief Knapp, on the other hand, explains that Mary Kavaney ("Deputy Assistant Kavaney"), a personal friend of Frantti's and the Assistant to Deputy Secretary Glazer, thought plaintiff "seemed unhappy" with his current work assignment in the PPU and

thought a change of scenery might be good for him.  Knapp Decl. ¶ 17; Dep. Vol. 1 at

231:15-233:10.  In PPU Unit Chief Knapp's telling, Deputy Assistant Kavaney hoped plaintiff

would "thrive[ ]" if given a new role.  Knapp Decl. ¶ 18.

In either case, Frantti, thinking it would be a good "resume builder," accepted the offer

to move over to DCJS.  Dep. Vol. 1 at 192:22-193-7, 197:7-22.  Plaintiff claims that he told

PPU Unit Chief Knapp, still one of his supervisors at DOB, that he only intended to stay in

this new assignment for one year before returning to work with DOB.  *Id*. at 199:2-6.  PPU

Unit Chief Knapp, however, claims that the DCJS assignment was not "in any way

[temporary] or of any kind of finite or limited duration."  Knapp Decl. ¶ 19.

## D.  <u>Frantti Joins DCJS</u>

Beginning on August 20, 2012 and going forward, Frantti considered himself to be "on

loan status" to DCJS.  Dep. Vol. 1 at 196:8-16; *see also* Frantti Aff. ¶ 31.  Plaintiff's new

assignment came with a new supervisor, DCJS Deputy Commissioner Jay Kiyonaga ("DCJS

Deputy Kiyonaga").  Dep. Vol. 1 at 195:14-16; Davis Decl., Dkt. No. 42-72, ¶ 6.

Frantti's new assignment also came with a new office, and he moved from the first

floor of the Capitol building into an office in Stuyvesant Plaza, a nearby building that housed

DCJS staff.  Dep. Vol. 1 at 193:16-194:8.  Notably, however, plaintiff's "on loan status" with

DCJS meant that Mike Matthews, a supervisor back at DOB, continued to sign off on

plaintiff's time records, and plaintiff's paychecks continued to come from DOB.  Dep. Vol. 1 at

195:18-196:12; *see also* Knapp Decl. ¶ 18.

At first, Frantti did not have any particular, day-to-day work responsibilities within

DCJS.  Dep. Vol. 1 at 199:14-19.  During the downtime associated with this initial transition

period, plaintiff took the opportunity to tell DCJS Deputy Kiyonaga, his new supervisor, about

his ongoing gastrointestinal illness.  Frantti Aff. ¶ 6 n.2; Dep. Vol. 1 at 48:18-49:5.

However, in early September of 2012, "a note went out" informing the heads of various New York State criminal justice agencies that Frantti had assumed responsibility for working on programs that dealt with alternatives to incarceration.  Dep. Vol. 1 at 199:20-200:3; *see also* Ex. A to Davis Decl., Dkt. No. 42-73 (e-mail announcing plaintiff's addition to DCJS's "public safety team").

Thereafter, it became Frantti's job to "listen[ ] to [the agency heads'] priorities" and relay this information to Deputy Secretary Glazer.  Dep. Vol. 1 at 200:17-19.  Plaintiff also attended meetings and helped draft legislation to secure more funding for these and related programs.  *Id*. at 200:19-201:12.

In the meantime, though, Frantti's medical problems continued.  From late October through mid-December of 2012, plaintiff missed "significant work time" when his illness "flared up."  Frantti Aff. ¶ 3.  Plaintiff soon came to believe he had contracted "giardia" on his trip to the Adirondacks.  Dep. Vol. 1 at 48:7-17; *see also* Frantii Aff. ¶¶ 6 n.2, 30.  Giardia is a microscopic, waterborne parasite that can cause diarrhea and other gastrointestinal problems in its host.  *See* Dep. Vol. 1 at 48:7-17.

During this period, Frantti underwent a series of medical examinations and several bouts of testing in an attempt to determine the root cause of his illness.  Dep. Vol. 1 at 48:21-49:5; Franti Aff. ¶ 6 n.2.  Among other things, Alan Fogel, M.D., plaintiff's primary care provider, referred him to a gastroenterologist, who sampled plaintiff's stool for the presence of the giardia parasite on multiple occasions.  Dep. Vol. 1 at 48:23-49:23.  However, three different stool tests came back "inconclusive," and plaintiff did not receive a giardia diagnosis as a result of these tests.  *Id*. at 49:21-23.

On November 27, 2012, Frantti received a message from DCJS Deputy Commissioner Marc Bonacquist ("DCJS Deputy Bonacquist") letting him know that DCJS Deputy Kiyonaga had left the agency to take on a different job. Frantti Aff. ¶ 39. Thereafter, DCJS Deputy Commissioner Terry Salo ("DCJS Deputy Salo") became plaintiff's new direct supervisor at DCJS. *Id.*; *see also* Dep. Vol. 1 at 195:15-18. According to plaintiff, DCJS Deputy Kiyonaga's departure caused his reason for being at DCJS to "largely evaporate[ ]." Frantti Aff. ¶ 39. However, plaintiff "continued to do meaningful work" for Deputy Secretary Glazer. *Id*.

In January of 2013, DCJS moved its offices from Stuyvesant Plaza to the Alfred E. Smith Building, a different New York State facility. Dep. Vol. 1 at 194:19-195:11. According to plaintiff, the move "didn't sit very well with the staff," who "lost their free parking and everything else." *Id*. at 195:11-13. The move certainly did not sit well with plaintiff, who lost his office and moved into a cubicle. Frantti Aff. ¶ 41.

### E. <u>Frantti's Illness Begins to Draw Scrutiny</u>

Between January of 2013 and May of 2013, Frantti continued to suffer gastrointestinal symptoms and his attendance at work was "sporadic." Frantti Aff. ¶ 6 n.2. When plaintiff did come to work, he displayed outward symptoms of distress. *Id*. For instance, plaintiff exhibited "sweating and a flushed face," "was frequently in the bathroom," and would "at times go home to take showers and change [ ] clothes throughout the work day." *Id*. According to plaintiff, it was only a "5-minute walk" to and from his office. *Id*. ¶ 19.

In March of 2013, Frantti asked Deputy Assistant Kavaney if he could be moved to the Office of Probation and Correctional Alternatives ("OPCA"), a different department within DCJS. Frantti Aff. ¶ 41. The next month, plaintiff's symptoms worsened and he missed "a

significant amount of time" at work.  Frantti. ¶ 6 n.2.

Near the end of April, Deputy Assistant Kavaney ordered Frantti to undergo an alcohol assessment.  Dep. Vol. 1, 237:7-13; *see also* Frantti Aff. ¶ 43.  According to plaintiff, Deputy Secretary Glazer and Deputy Assistant Kavaney met with him and explained that they were "concerned about [his] health [ ] and appearance."  Frantti Aff. ¶ 43.

On April 26, 2013, Frantti underwent the alcohol assessment ordered by Deputy Assistant Kavaney.  Frantti Aff. ¶ 44.  The examiner concluded that "there was no alcohol problem and anything that was showing in [plaintiff's] outward appearance was only associated with health problems [he] was experiencing."  Dep. Vol. 1 at 238:13-18; *see also* Frantti Aff. ¶ 45.

Even so, Deputy Secretary Glazer and Deputy Assistant Kavaney reprimanded plaintiff by placing a "counseling memo" in his personnel file.  Dep. Vol. 1 at 238:7-12; *see also* Frantti Aff. ¶ 46.  There is some disagreement about whether the reprimand occurred in *spite* of the fact plaintiff had passed the alcohol assessment or because of a *different* alcohol-related incident in which Deputy Assistant Kavaney smelled alcohol on plaintiff's breath during a "hastily called meeting" that required plaintiff to come into work on a weekend evening.  *Compare* Dep. Vol. 1 at 225:13-21, *with id.* at 238:19-239:11.

Because Frantti enjoyed a personal friendship with Deputy Assistant Kavaney, he acknowledged that she had observed him consume alcohol at work functions and other occasions.  *See, e.g.*, Dep. Vol. 1 at 239:12-241:2.  However, plaintiff contends he had never been reprimanded on this basis before.  Frantti ¶ 43.

Frantti further asserts that this counseling memo caused the "poisonous suggestion that [he] had a drinking problem" to "make its way into [his] professional life" even though

"the issue had been conclusively resolved by the professional evaluation" ordered by DCJS.  Frantti ¶ 48.

On May 13, 2013, DCJS re-assigned Frantti to work in OPCA, the inter-department change he had requested from Deputy Assistant Kavaney back in March.  Frantti Aff. ¶ 42; Adams Decl., Dkt. No. 42-28, ¶ 6.

The next day, Frantti met with his new direct supervisor, DCJS Executive Deputy Director John Adams ("DCJS Deputy Adams"), and DCJS Director Robert Maccarone ("DCJS Director Maccarone"), to discuss his new placement with OPCA.  Adams Decl. ¶ 9.  Because plaintiff's physical symptoms continued to cause him to miss time at work throughout this period, DCJS Deputy Adams instructed plaintiff to e-mail him directly if he was not going to arrive at work by 9:30 a.m., the start of OPCA's working day.  *Id.*

## F.  Frantti Recovers

In June or July of 2013, Frantti, by then desperate for a cure, contacted the Albany Medical Center for Infectious Diseases and requested "Flagyl," a type of medicine used to treat giardia.  Dep. Vol. 1 at 50:2-13; Frantti Aff. ¶ 49.  Although no medical provider ever actually diagnosed plaintiff with giardia, Dr. Kennedy, a physician at the Albany Medical Center, agreed to prescribe plaintiff a ten-day course of Flagyl anyway.  Dep. Vol. 1 at 49:21-50:12.  Plaintiff began the treatment immediately, and all of his various gastrointestinal symptoms cleared up by the fifth day.  *Id*. at 50:11-12; 124:11-15.  *see also* Frantti Aff. ¶ 49.

But Frantti's troubles were not over.  In June or July of 2013, Deputy Secretary Glazer departed from State service.  Dep. Vol. 1 at 201:20-202:8.  According to plaintiff, Deputy Secretary Glazer's departure meant that the "reason for [his] assignment [at DCJS] ceased to exist."  Frantti Aff. ¶ 39.  In plaintiff's view, Deputy Secretary Glazer was the person who

initially convinced him to sign on to DCJS and had been the source of plaintiff's work assignments at DCJS since his move over from DOB. Dep. Vol. 1 at 200:17-202:23.

With Deputy Secretary Glazer gone, Frantti believed that he had no meaningful work assignments. Dep. Vol. 1 at 203:11-19; *see also* Frantti Aff. ¶ 68. Plaintiff felt that he was in a "limbo state" because "nobody knew what to do with [him]" after Deputy Secretary Glazer left. Dep. Vol. 1 at 212:2-5. In fact, plaintiff testified that:

> A.  I would go to work, sit in an office on the third floor in the Office of Probation and Correctional Alternatives and try to make the best of it . . . .
>
> . . . .
>
> Q.  But during that period of time from June of 2013 . . . , what was your typical day at work like? What did you do on a typical day of work during that period of time?
>
> A.  I showed up, went to work, followed Capital [*sic*] Confidential [a regional news site] on the internet. I did nothing.

Dep. Vol. 1 at 203:14-17, 211:5-12. Indeed, plaintiff estimates that "85-95%" of his time at work was "unoccupied" during this time period. Frantti Aff. ¶ 67.

At this point, Frantti attempted to leave DCJS and return to DOB. Dep. Vol. 1 at 205:18-206:5. On August 28, 2013, plaintiff e-mailed DOB Administrative Officer Karen Orcutt ("DOB HR Officer Orcutt") to ask what he "would need to do to make [his] return [to DOB] happen." Ex. A to Orcutt Decl., Dkt. No. 42-53, p. 2.[3]

DOB HR Officer Orcutt responded the same day, explaining that DOB's "needs have not changed and therefore [Frantti's] placement at DCJS will continue" for now. Ex. A to Orcutt Decl. at p. 2; *see also* Dep. Vol. 1 at 207:9-14. DOB HR Officer Orcutt's response

---

[3] Pagination corresponds to CM/ECF.

further explained that while plaintiff could return to his "hold item" at Grade 27 if he wanted to get his civil service protections back, he would still remain assigned to DCJS for the foreseeable future. *Id*.

Frantti replied back, asking about the status of his Grade 27 civil service "hold item." Ex. A to Orcutt Decl. at p. 2. Although a "hold item" can expire, the New York State Civil Service Commission can approve an extension under certain circumstances. Orcutt Decl., Dkt. No. 42-52, ¶ 12. DOB HR Officer Orcutt again e-mailed plaintiff back, letting him know that DOB had actually just requested an extension on plaintiff's behalf, but were waiting to hear back. Ex. A to Orcutt Decl. at p. 1.

During this period, Frantti applied to positions that were available back at DOB. Frantti Aff. ¶ 26. Plaintiff claims, "upon information and belief," that he was "not considered" for the openings to which he applied. *Id*.; *see also id*. ¶ 66 (claiming DOB failed to take him back because he was "damaged goods"). Notably, a civil service "hold item" like the one plaintiff maintained on his Grade 27 position guaranteed him a specific salary grade, not a specific work assignment. Orcutt Decl., Dkt. No. 42-52, ¶ 12.

Frantti continued working at OPCA. Adams Decl. ¶¶ 10-16. DCJS Deputy Adams, who supervised plaintiff during this period, believes that plaintiff routinely failed to display the typical work habits expected of a Grade 31 employee. *Id*. ¶ 16. Among other things, DCJS Deputy Adams believed that plaintiff lacked initiative, frequently asked for extensions on assignments, and seemed to lack interest in the projects to which he had been assigned. *Id*. Equally problematic, plaintiff was frequently absent from his work station for extended periods and could not be located. *See, e.g.*, Ex. E to Adams Decl., Dkt. No. 42-33, pp. 1, 3, 9.

On August 29, 2013, Frantti e-mailed DOB HR Officer Orcutt again, this time expressing concern that the New York State Civil Service Commission's next meeting would not occur until September 10, a date on which his "hold item" at Grade 27 would have already expired. Ex. A to Orcutt Decl. at p. 1. DOB HR Officer Orcutt's response explained that any extension approved by the State Civil Service Commission would be retroactive, and in any event even an unapproved extension would allow plaintiff "an opportunity to return to the competitive hold item" at Grade 27. *Id*.

### G. Frantti Draws Renewed Scrutiny

In September of 2013, after about three months of near-constant downtime at work, Frantti decided he should let someone at DCJS know that he had nothing to do. Pl.'s Vol. 1 at 203:14-23. Plaintiff sought out DCJS Human Resources Management Director Karen Davis ("DCJS HR Director Davis"), told her that his "health felt better," and asked for some new work assignments. Dep. Vol. 1 at 204:7-20.

On September 25, 2013, DOB HR Officer Orcutt sent Frantti a letter informing him that the New York State Civil Service Commission had approved the extension of his Grade 27 "hold item" until March 1, 2014. Ex. B to Orcutt Decl., Dkt. No. 42-54.

Shortly thereafter, Frantti was called to a meeting at which DCJS HR Director Davis, DOB HR Officer Orcutt, DCJS Deputy Bonacquist, and Erin Ryan ("HR Officer Ryan"), another HR officer, were present. Dep. Vol. 1 at 124:18-23; *see also* Pl.'s Dep. Vol. 2, Dkt. No. 42-5, 371:10-15 ("Dep. Vol. 2").

Together, these officials informed Frantti that he would no longer be working in the special DCJS role that Deputy Secretary Glazer had carved out for him and would in fact be subject to a two-month performance evaluation to determine whether he was still "working at

- 16 -

a Grade 31 level" at all.  Dep. Vol. 1 at 188:14.

According to DOB HR Officer Orcutt, the New York State Civil Service Commission's six-month extension of Frantti's "hold item" at Grade 27 required DOB to figure out how to place plaintiff going forward; *i.e.*, whether to try to extend plaintiff's hold item again (keeping him at the non-competitive Grade 31 position a while longer) or to just return plaintiff to the competitive Grade 27 position outright.  Orcutt Decl. ¶¶ 15-16.  In DOB HR Officer Orcutt's view, a formal, written evaluation of plaintiff's work performance would help DOB make an informed decision about that choice.  *Id*. ¶ 16.

Frantti, however, found this two-month evaluation unexpected and unfair.  Dep. Vol. 1 at 247:3-14.  Plaintiff perceived the evaluation to be an "over-reaction" to a single instance in which he had been late to work as a result of oversleeping.  Frantti Aff. ¶ 59.  Concerned, plaintiff reached out to a quasi-union organization for non-competitive employees, who told him that this two-month evaluative period was "extremely unusual."  Dep. Vol. 1 at 247:3-14.

Unusual or not, Frantti's evaluation took place in the two-month period between October 30 to December 31, 2013.  Dep. Vol. 2 at 300:9-11; *see also* Dep. Vol. 1, 248:12-22.  Plaintiff's direct supervisor, DCJS Deputy Adams, took responsibility for conducting the evaluation and met with plaintiff periodically to discuss work assignments with him.  Adams Decl. ¶¶ 21-22.

Frantti contends that he "was not given any grade 31 work to do" during this period even though he repeatedly requested "more challenging" or "more meaningful" work "commensurate with [his] experience."  Frantti Aff. ¶ 50; Dep. Vol. 1 at 253:4-19.  Plaintiff claims that he made these requests of DCJS Deputy Adams, DCJS Director Maccarone, and DOB HR Officer Orcutt.  Dep. Vol. 1 at 250:11-251:1.  Plaintiff contends that these requests

were "denied without explanation." *Id*. at 250:11-17.

Instead, Frantti claims he received assignments that he believed were "low level, menial work," such as updating outdated lists of probation office contact numbers for each county across the State. Dep. Vol. 1 at 246:13-247:2; *see also* Frantti Aff. ¶ 50 (characterizing his work assignments as "exclusively clerical"). Plaintiff contends this evaluation was "clearly a smoke-screen to permit the removal of [his] Grade 31 status." Frantti Aff. ¶ 52.

On November 5, 2013, Frantti took a "floating holiday" off from work without providing DCJS Deputy Adams, his supervisor, any advance notice. Ex. E to Adams Decl. at p. 17. In an e-mail sent after the fact, DCJS Deputy Adams provided plaintiff with the relevant DCJS policy on floating holidays (which differed from the one employed by DOB) and requested that plaintiff provide him with advance notice in the future. *Id*.

### H. Frantti Gets Sick Again

In December of 2013, several people in Frantti's office at DCJS "came down with a stomach bug." Dep. Vol. 1 at 125:19:22. Although plaintiff had been virtually symptom-free until this point, plaintiff suddenly experienced a recurrence of the same gastrointestinal issues he had previously suffered through until mid-2013. *Id*. at 126:8-11. This time around, the physical symptoms would last for nearly three years, refusing to clear up until plaintiff eventually resigned from State employment in July of 2016. *Id*. at 127:9-14.

The recurrence of Frantti's physical symptoms caused him to begin missing more time at work. For instance, on December 30 and 31, 2013, plaintiff took unscheduled leave. Adams Decl. ¶¶ 27-28. Although plaintiff e-mailed DCJS Deputy Adams to let him know, Adams replied by asking plaintiff to make sure he calls in by 11:00 a.m. each day in

accordance with DCJS's written call-in policy.  *Id*.  In plaintiff's view, his supervisors began to "magnif[y]" these kind of "trivial violations" in an effort to "either build a case to eventually terminate [his] employment or to force [him] to resign."  Frantti Aff. ¶ 57.

In January of 2014, Frantti's gastrointestinal condition "worsened" and plaintiff missed "nearly the entire month" of work.  Frantti Aff. ¶ 6 n.2; *see also* Adams Decl. ¶¶ 35-40.  Among other limitations, the abdominal discomfort plaintiff felt often made it impossible for him to sit at his desk during the working day.  Dep. Vol. 1 at 139:9-140:5.

Frantti's symptoms forced him to get up from his desk and "walk[ ] up and down the hall" for "roughly five or ten minutes" on a frequent basis.  Dep. Vol. 1 at 139:16-141:7.  This occurred between "five to a dozen" times each day plaintiff worked, though the precise number of these walking breaks varied.  *Id*. at 141:8-18.

In addition, Frantti would visit the bathroom "on average, six to ten times a day" for "anywhere between two to ten minutes."  Dep. Vol. 1 at 165:23-167:3.  On these occasions, plaintiff frequented a private, locked bathroom on the third floor of his building.  *Id*. at 166:10-21.  However, plaintiff also "preferred the privacy of [the bathroom in his] own home" and would sometimes leave work for that purpose.  *Id*. at 172:18-173:22.

According to Frantti, he still lived only a "short block" away from the office during this time.  Dep. Vol. 1 at 173:16-22.  No one ever prevented plaintiff from going to the bathroom—at work or at home—during this period of time.  *Id*. at 173:23-174:5.  However, on several occasions, plaintiff's supervisors reprimanded him for not being present at his desk when they came to speak with him about work assignments.  *Id*. at 138:7-9; *see also* Frantti Aff. ¶ 75.

## I. Frantti Tries to Leave DCJS

On January 7, 2014, Frantti e-mailed DCJS HR Director Davis as a "first step in determining how to proceed in returning to DOB." Ex. B to Davis Decl., Dkt. No. 42-74, p. 4. As plaintiff describes it, this e-mail explained that he had been receiving "only clerical assignments" at OPCA and that he wanted out of DCJS. Frantti Aff. ¶ 61.

In Frantti's view, this e-mail also put DCJS HR Director Davis on notice that he felt "singled out" and "harassed" by the two-month performance evaluation DCJS had conducted at the end of 2013. Dep. Vol. 2 at 322:9-324:3. Plaintiff's e-mail also expressed concern about the fact that he had been moved from his office into a cubicle shortly after Deputy Secretary Glazer left. *Id*. at 324:9-17. According to plaintiff, it was "unusual for a Grade 31 individual" to be put in a cubicle. *Id*.

On January 8, 2014, DCJS HR Director Davis replied to Frantti's e-mail, explained that she had "no authority to influence [the] process" of returning to DOB, and suggested that plaintiff contact DOB's HR Office "to see if they, as your employer, can assist you in current and future career opportunities there." Ex. B to Davis Decl. at p.1.

Between January 13, 2014, and May 28, 2014, Frantti illness caused him to be in and out of work. Dep. Vol. 2 at 429:2-10. For instance, there were periods where he was "out several days in a row" and then there were "days where [he] was out partial days, then a full day and then a partial day." *Id*. at 429:6-10; *see also* Orcutt Decl. ¶ 28 (noting plaintiff was absent from work for "significant periods of time" through February 2014); Adams Decl. ¶ 40 (noting that plaintiff "was barely in the office" after January 31, 2014).

On January 21, 2014, Frantti received a letter from DOB HR Officer Orcutt about the Family Medical Leave Act ("FMLA"). Dep. Vol. 2 at 357:23-359:4; *see also* Ex. C to Orcutt

Decl., Dkt. No. 42-55. This letter enclosed a "medical certification form" that, once completed by a health care provider, would permit the State to determine whether plaintiff qualified for leave under the FMLA. *Id*. Thereafter, plaintiff made an appointment with Dr. Fogel, his primary care doctor, to figure out whether FMLA leave might be helpful to him. Dep. Vol. 2 at 359:13-360:9.

On January 31, 2014, Frantti was called to a meeting with DOB HR Officer Orcutt, DCJS HR Director Davis, DCJS Deputy Adams, and HR Officer Ryan to discuss a recent work incident. *See* Ex. C to Orcutt Decl. at pp. 3-4; *see also* Frantti Aff. ¶ 62.

According to DOB HR Officer Orcutt, Frantti had been "visibly agitated and loudly disruptive in the DCJS office that morning," complaining about being stuck at DCJS in front of other DCJS employees. Orcutt Decl. ¶ 24. At this meeting, the supervisory team warned plaintiff that his behavior was "below expectations" for an employee of his position. Frantti Aff. ¶ 63. The outcome of this meeting was later memorialized in a February 7, 2014 counseling memo. Ex. C to Orcutt Decl. at pp. 3-4.

Frantti acknowledges this incident but characterizes it differently. In his telling, plaintiff had asked some of the other employees whose work stations were located near him "if they had wondered why [he] was there and what [he] did and why [he] was a Grade 31 . . . with little or nothing to do." Dep. Vol. 2 at 269:19-270:2, 271:21-272:4. Plaintiff denies "yelling or shouting" and insists "there were no angry exchanges." Frantti Aff. ¶ 62.

In any event, Frantti kept missing work. On February 11, 2014, DOB HR Officer Orcutt sent plaintiff a letter informing him that he would be removed from his non-competitive Grade 31 position and reinstated to the lower, competitive Grade 27 position. Ex. C to Orcutt Decl. at p. 10; *see also* Frantti Aff. ¶ 63. According to DOB HR Officer Orcutt, this decision

was made in part as a result of the two-month performance evaluation.[4]  Orcutt Decl. ¶¶ 23, 26.  As a result of this change in grade, plaintiff suffered a $15,000 reduction in his salary.  Dep. Vol. 1 at 249:17-250:8.  According to plaintiff, this was the first "unsatisfactory" or "below expectations" evaluation he had ever received.  Dep. Vol. 2 at 365:20-366:11; Frantti Aff. ¶ 81.

On February 28, 2014, DOB HR Officer Orcutt sent Frantti a follow-up letter inquiring about whether or not plaintiff would be submitting a medical certification form under the FMLA.  Ex. C to Orcutt Decl. at p.11.  According to this letter, plaintiff had not yet submitted one he had been sent in mid-January and therefore his repeated absences from work could not yet be designated as FMLA leave.  *Id*.

Frantti's attendance problems continued through March.  On March 28, 2014, plaintiff received a letter from DCJS HR Director Davis and DCJS Deputy Adams stating that he had missed more than twenty-five full days of work since December 30, 2013.  Ex. J to Adams Decl., Dkt. No. 42-38 ("March 28 Memo"); *see also* Dep. Vol. 2, 397:12-398:5, 403:13-16, 404:5-10.  As a result of these continued absences, plaintiff was placed on "documentation status" for the next six months, a DCJS policy that required him to provide medical documentation for any full or partial day absences due to illness.  Ex. J to Adams Decl.

Frantti acknowledges that this more onerous "one-day note requirement" was a regular component of DCJS employee policy at the time.  Dep. Vol. 2 at 404:10-11; *see also* Davis Decl. ¶ 11 (explaining it was "standard DCJS policy to place employees who have

---

[4]  Frantti believes that PPU Unit Chief Knapp made this decision.  Pl.'s Vol. 2, 137:6-23.  Notably, plaintiff testified that PPU Unit Chief Knapp is the same supervisor who initially promoted him to Grade 31 in the first place.  Pl.'s Vol. 2, 267:19-268:20.

excessive unscheduled absences" on this requirement).  According to DCJS HR Director Davis:

> Placing plaintiff on a one-day medical excuse note requirement did not mean that he had to come in and hand in a medical excuse note every day even if he was out of work multiple days in a row.  He could provide one medical excuse note that covered multiple days of absence and he just had to provide that when he eventually returned to work.  He could also provide a note that covered multiple days in a row going forward if he wished.  He could also simply fax it in, or have his doctor fax it in.

Davis Decl. ¶ 10; *see also* Adams Decl. ¶ 47.

Frantti, however, interpreted this requirement to mean that:

> A.  One of the things I was required to do was to write a medical note if I missed partial time, so, say, for example, I was sick and I started to feel better around noon.  Well, in which case I would have to find time to go to a doctor's office, make an appointment with the doctor's office, wait for the doctor's officer, see the doctor and then return to work and provide the doctor's note in that time, which essentially would be a fully workday by the time all that stuff would happen in going to see a doctor for having just missed a partial day rather than a full day.

Dep. Vol. 2 at 45:16-476:4.

On March 31, 2014, nearly two months after he first received it from HR, Frantti finally provided DOB with an FMLA medical certification form completed by Dr. Fogel.  Ex. F to Orcutt Decl., Dkt. No. 42-58.  This form did not diagnose a particular medical condition but merely characterized plaintiff's ongoing illness as "unpredictable exacerbations of dizziness, nausea, and gastrointestinal dysfunction." *Id*. at p. 2.  According to Dr. Fogel's certification, plaintiff would be "unable to attend work or perform assigned duties" during "episodic flare-ups" of "variable" and "unpredictable" duration that were likely to occur "0-3" times per month for "1-3" days at a time. *Id*. at p. 2-3.

**J. Frantti Takes FMLA Leave**

On April 3, 2014, DOB HR Officer Orcutt sent Frantti a letter approving a period of FMLA leave made retroactive to mid-January of 2014.  Ex. C to Orcutt Decl. at p. 14; *see also* Dep. Vol. 1 at 138:3-139:8; Dep. Vol. 2 at 361:19-365:4.  Thereafter, DOB received an amended FMLA medical certification form that indicated plaintiff could be expected to suffer "episodic flare-ups" "1-3" times per month for "3-24" hours per episode.  Ex. G to Orcutt Decl., Dkt. No. 42-59.  The amended form further indicated that plaintiff might need "5-10" minute "breaks" every "2-3" hours.  *Id*.

Notably, Frantti's DCJS supervisors rescinded the one-day medical note requirement shortly after he finally submitted his FMLA paperwork.  On April 4, 2014, DCJS HR Director Davis and DCJS Deputy Adams met with plaintiff to discuss the parameters of his FMLA leave.  *See* Ex. C to Davis Decl., Dkt. No. 42-75, p.1.  In a follow-up e-mail, DCJS HR Director Davis sent plaintiff some additional FMLA information and specifically "lift[ed] the requirement that [plaintiff] provide [ ] documentation for every absence."  *See id*.

However, the e-mail also reminded Frantti that he remained obligated "to follow the protocols set in place for all DCJS employees, including the call-in procedure as described [in their meeting]."  Ex. C to Davis Decl. at p. 1.  Finally, the e-mail referred plaintiff to the appropriate section of the DCJS employee handbook for further information.  *Id.*

On April 28, 2014, still on FMLA leave, Frantti served on a jury during a two-week trial.  Adams Decl. ¶ 52; *see also* Dep. Vol. 3 at 709:20-717:5.  Plaintiff did not require any accommodations for his gastrointestinal problems during the trial.  Dep. Vol. 3 at 716:20-22.

However, Frantti continued to take unscheduled leave from work following the completion of his jury service.  Adams Decl. ¶¶ 52-53.  Plaintiff insists that "[a]ny attempts

[he] made to expand the scope of [his work] duties were discouraged" during this period. Frantti Aff. ¶ 83. According to DCJS Deputy Adams, however, plaintiff's frequent partial and full-day absences prevented him from assigning plaintiff "anything even approaching a normal workload." Adams Decl. ¶ 54.

For example, on May 28, 2014, DCJS Deputy Adams went looking for Frantti at his desk but could not find him. Adams Decl. ¶ 56. At around 1:00 p.m., DCJS Deputy Adams called plaintiff's cell phone to ask why he had not followed DCJS's call-in policy. *Id*. Plaintiff answered and claimed that he was too sick to make it to the phone, but would try to come in later. *Id*.

On June 3, 2014, Frantti violated DCJS's call-in policy again. Adams Decl. ¶ 57. According to DCJS Deputy Adams, plaintiff called to say he would be late, but never showed up to work at all that day. *Id*. DCJS Deputy Adams claims that plaintiff again failed to follow the call-in policy just two days later. *Id*. ¶ 58. When DCJS Deputy Adams called plaintiff's cell phone to ask why he had failed to come to work on that occasion, plaintiff said that he had been asleep. *Id*. These sorts of recurrent violations of the DCJS call-in policy continued to occur on DCJS Deputy Adams's watch. *See, e.g.*, Adams Decl. ¶¶ 59, 61-62.

## K. Frantti's Leave Expires

On June 9, 2014, DCJS HR Director Davis sent Frantti a letter informing him that he had exceeded his approved period of FMLA leave. Ex. C to Orcutt Decl. at p. 15. This letter accused plaintiff of failing to comply with "verbal and written directives" from DCJS Deputy Adams that instructed plaintiff to "call in within two hours of the start of [any] work day" in which he would be absent. *Id*. This letter also contemplated "possible disciplinary action." *Id*.

On June 17, 2014, DCJS HR Director Davis sent DOB HR Officer Orcutt a letter stating that DCJS recommended withholding Frantti's yearly salary increase as a result of his "documented poor performance and insubordination."  Ex. H to Orcutt Decl., Dkt. No. 42-60. DOB HR Director Orcutt forwarded this adverse recommendation to the DOB Budget Director, who approved it.  Orcutt Decl. ¶ 35.  Plaintiff was denied a 2014 salary increase.  *Id*.

On July 8, 2014 DOB HR Officer Orcutt sent Frantti a letter informing him that he had exhausted his FMLA coverage as of May 28, 2014.  Ex. C to Orcutt Decl. at p. 17.  This letter re-imposed the one-day medical excuse note requirement in accordance with DCJS policy.  *Id*.; *see also* Davis Decl. ¶ 14.

On July 10, 2014, DOB HR Officer Orcutt sent Frantti a letter directing him to appear at a hearing that would be conducted in accordance with Section 75 of the Civil Service Law.  Ex. C to Orcutt Decl. at p. 18.  According to DOB HR Officer Orcutt, DOB convened the hearing to consider whether plaintiff should be disciplined for his repeated violations of DCJS's call-in policy.  Orcutt Decl. ¶ 36.

Frantti, who associates a Section 75 hearing with "the procedure for terminating an employee," contends that the use of the Section 75 hearing in this case "was a knowing attempt to terrify [him.]"  Frantti Aff. ¶¶ 64, 77.  Following that hearing, plaintiff signed a "settlement in lieu of discipline" that indicated a Letter of Reprimand would be placed in his personnel file.  Ex. C to Orcutt Decl. at p. 31 (July 30, 2014 memo).

On September 18, 2014 DOB HR Officer Orcutt sent Frantti a letter detailing 62 additional hours of "unscheduled absences" between July 28 and August 27, 2014 for which plaintiff had failed to provide medical documentation.  Ex. C to Orcutt Decl. at p. 32-33.  This letter reminded plaintiff that DCJS policy required plaintiff to provide a doctor's note and to

notify his supervisor within two hours of his assigned start time.  *Id*.

On October 7, 2014, DOB HR Officer Orcutt sent Frantti a letter explaining that DOB had received medical documentation from Dr. Fogel.  Ex. C to Orcutt Decl. at p. 34.  This letter explained that DOB considered this doctor's note sufficient to excuse plaintiff's 62 hours of recent absences.  *Id*.  However, this letter also reminded plaintiff that DCJS policy required him to submit medical documentation for any unscheduled absences at the end of each pay period.  *Id*.  This letter further explained that any medical documentation going forward "must specify the dates and times of each excused absence."  *Id*.

Frantti continued to miss full and partial days of work throughout October and November of 2014.  Orcutt Decl. ¶ 40.  Then, between November 12, 2014, and November 30, 2014, plaintiff only showed up for one day of work.  Adams Decl. ¶ 63.

On November 13, 2014, and again on December 11, 2014, Frantti wrote to DOB HR Officer Orcutt and DCJS HR Director Davis asking for an accommodation "which would allow [his] physician to write excuses after an accumulated amount of absence from work rather than being required to be seen by his physician daily for an excuse."  Dep. Vol. 2 at 451:5-12, 453:6-12.  According to plaintiff, neither HR official responded to this request.  *Id*. at 473:14-16.  Plaintiff did not follow up on either letter.  *Id*. at 473:17-20.

Frantti believed this "accommodation" to be a necessary one because Dr. Fogel, his primary care physician, felt "burden[ed]" by the requirement of writing repeated notes.  Dep. Vol. 2, 474:2-19.  As plaintiff explains:

> A.  One of the things I was required to do was to write a medical note if I missed partial time, so, say, for example, I was sick and I started to feel better around noon.  Well, in which case I would have to find time to go to a doctor's office, make an appointment with the doctor's office, wait for the doctor's office, see the doctor and then

to return to work and provide the doctor's note in that time, which essentially would be a full workday by the time all that stuff would happen in going to see a doctor for having just missed a partial day rather than a full day.

Dep. Vol. 2 at 475:16-476:4.  Plaintiff further testified that Dr. Fogel refused to write notes without actually seeing him in person for each day he was sick.  *Id*. at 477:1-14.

## L. **Frantti Tries Short-Term Leave**

In December of 2014, Frantti began a six-month "short-term disability leave."  Dep. Vol. 2 at 503:16-504:2; *see also* Ex. I to Orcutt Decl., Dkt. No. 42-60.  During the 2014 calendar year, plaintiff had been absent for a full or partial day on 240 different working days.  Adams Decl. ¶ 79.

Frantti's short-term leave meant that he was no longer obligated to submit any medical notes or call-in to work when he felt sick.  Orcutt Decl. ¶ 40.  However, plaintiff would not be paid a salary during this period unless his disability insurer approved his claim.  *Id*.  At some point thereafter, the insurer denied his claim.  Dep. Vol. 2, 508:18-509:2, 510:22-511:10.

In January of 2015, Mary Beth Labate became the DOB's Budget Director ("DOB Budget Director Labate").  Labate Decl., Dkt. No. 42-76, ¶¶ 2, 7.  Among other things, DOB Budget Director Labate oversaw the Administrative Services Unit ("ADU"), the operating unit within DOB responsible for human resources and administrative matters.  *Id*. ¶ 8.

In May of 2015, Frantti informed DOB that he intended to return to work from his short-term leave of absence.  Orcutt Decl. ¶¶ 43-44.  In response, DOB directed plaintiff to provide a doctor's note "medically clearing" him to return to work.  *Id*. ¶ 44.  Later that month, plaintiff wrote to DOB Budget Director Labate to complain about his mistreatment.  Dep. Vol. 3 at 524:7-525:12; Ottaviano Decl. ¶ 13; Frantti Aff. ¶ 94.

Frantti also sent this letter to DCJS HR Director Davis, DOB HR Officer Orcutt, and Mike Green, the head of DCJS. Dep. Vol. 3 at 525:3-15. He did not receive a response from any of these officials. *Id*. at 525:22-23. However, one of these officials referred plaintiff's letter to the Governor's Office of Employee Relations ("GOER") for an investigation. Dep. Vol. 3 at 526:1-8; *see also* Ottaviano Decl. ¶ 13.

GOER engaged Richard Snyder, an Affirmative Action Officer employed by the New York State Department of Health ("Officer Snyder"), to investigate the allegations in Frantti's May 2015 letter. Dep. Vol. 3 at 525:20-529:3; *see also* Ex. K to Ottaviano Decl., Dkt. No. 42-25 (July 30, 2015 report).

Officer Snyder reached out to Frantti, and the two had "multiple discussions" about plaintiff's work situation. Dep. Vol. 3 at 525:20-529:3. Plaintiff also gave Officer Snyder a packet of information, but never heard back after that. *Id*. at 534:5-21. According to Officer Snyder's report, he recommended "no further action" be taken in response to plaintiff's complaint. Ex. K to Ottaviano Decl., Dkt. No. 42-25, p.8.[5]

In June of 2015, DOB Budget Director Labate approved the denial of Frantti's 2015 salary increase. Labate Decl. ¶ 16. This recommendation again came from DCJS HR Director Davis, who cited plaintiff's alleged "poor work performance" and repeated failure to follow DCJS time and attendance policies. Orcutt Decl. ¶ 42.

On June 9, 2015, Dr. Fogel sent DOB a letter medically clearing Frantti to return to work. Ex. L to Orcutt Decl., Dkt. No. 42-64. Notably, this letter did not include any work

---

[5]  Officer Snyder would later investigate the allegations in plaintiff's second civil rights complaint and conclude that both were "without merit." Ex. L to Ottaviano Decl., Dkt. No. 42-26, p. 5 (September 25, 2015 report). Both reports are stamped as "draft." However, defendants contend that both are in fact the "final" reports generated by Officer Snyder. Plaintiff does not appear to contest this precise issue, but in any event the information is presented only for context and therefore the distinction is immaterial.

restrictions.  *Id*.  Plaintiff returned from his six-month leave the next day.  Orcutt Decl. ¶ 49.

### M.  Frantti Returns to Work

On June 10, 2015, his first day back at work, Frantti received another "below expectations" performance evaluation from DCJS Deputy Adams, primarily as a result of his failure to comply with DCJS's attendance policy.  Dep. Vol. 3, 535:3-17; *see also* Adams Decl. ¶ 66.  According to this document, "[t]here were times when [plaintiff] would call after the call-in time, not call, and other times when he did not show up for a whole day of work as expected."  *Id*. at 539:14-17.  This evaluation covered the period between April 1, 2014 through March 31, 2015.  Labate Decl. ¶¶ 18, 20; Orcutt Decl. ¶ 50.

Later in June of 2015, Frantti administratively appealed from this "below expectations" performance evaluation.  Labate Decl. ¶¶ 18, 20; Orcutt Decl. ¶ 50.  While plaintiff waited to hear back about the status of this appeal, he continued to struggle with DCJS's time and attendance policies, repeatedly missing full or partial days of work.  Orcutt Decl. ¶ 51.  According to DOB HR Officer Orcutt, DCJS HR Director Davis "wanted to pursue disciplinary action against plaintiff as a result of his repeated and continued violations of DCJS call-in policy."  Orcutt Decl. ¶ 52.

On June 17, 18, and 23, Frantti again violated the DCJS call-in policy.   Adams Decl. ¶¶ 72-75.  Near the end of the month, plaintiff wrote to DOB HR Officer Orcutt to request a reassignment to DOB and to complain about how the upcoming BPAP portion of the Grade 31 examination plaintiff had signed up to re-take would be administered.  Ex. M to Orcutt Decl., Dkt. No. 42-65.

In Frantti's view, his ongoing placement at DCJS was "improper," put him at "a severe disadvantage to the other candidates," and would prevent him from passing the exam.  Ex. M

to Orcutt Decl. DOB HR Officer Orcutt's response denied plaintiff's request to return to DOB and noted that "candidates are not entitled to new assignments for the purpose of the exam." *Id*.

On July 2, 2015, several things happened. First, DCJS reassigned Frantti to its Office of Finance's Budget Unit. Pl.'s Vol. 2 at 350:6-12; *see also* Adams Decl. ¶ 86; Frantti Aff. ¶ 72. Going forward, Budget Unit Supervisor Chris Amado ("DCJS Supervisor Amado") directly supervised plaintiff. Amado Decl., Dkt. No. 42-42, ¶ 5. On his first day, plaintiff met with DCJS Supervisor Amado and DCJS Office of Finance Chief Budget Analyst Carol Rochester ("DCJS Chief Analyst Rochester") to discuss the nature of plaintiff's new role. Amado Decl. ¶ 10.

Among other things, Frantti was again informed of the DCJS call-in policy even though he refused to sign the form acknowledging he had received it. Amado Decl. ¶ 10. DCJS Supervisor Amado also informed plaintiff that he would be observing and evaluating plaintiff's performance on the BPAP portion of the Grade 31 examination. *Id*. ¶ 114. Plaintiff again objected to this arrangement. In plaintiff's view, DCJS Supervisor Amado, a lower grade employee with fewer years of experience, should not be assigned to review him. Dep. Vol. 3 at 568:7-570:18.

Second, at DCJS's request, DOB arranged for Frantti to be examined by the New York State Department of Civil Service Employee Health Services ("EHS") to determine his fitness to perform the duties of his job as Associate Budget Examiner. Ex. C to Orcutt Decl. p. 35.

Third, Frantti submitted the first of two civil rights complaints to the New York State Division of Human Rights ("DHR"). Pl.'s Vol. 3 at 625:12-16; *see also* Ex. A to Ottaviano Decl., Dkt. No. 42-15 (copy of complaint notarized on July 1, 2015).

Frantti's first DHR complaint alleged disability discrimination and retaliation against the DOB, DOB Budget Director Labate, DOB HR Officer Orcutt, and PPU Unit Chief Knapp arising from (1) his demotion to Grade 27 and (2) the denial of his salary advances. Ex. A to Ottaviano Decl. at pp.10-11.

Frantti also wrote to Jerry Boone, the President of the New York State Civil Service Commission, the agency responsible for administering civil service exams, to complain about the way his BPAP exam was going to be administered. Dep. Vol. 3 at 563:3-14.

On July 3, 2015, Frantti failed to show up for work until around 11:00 a.m. Amado Decl. ¶ 11. On July 6, 2015, DCJS Supervisor Amado and DCJS Chief Analyst Rochester met with plaintiff to remind him about DCJS's two-hour call-in policy. Amado Decl. ¶ 12. Shortly afterward, DCJS Supervisor Amado furnished plaintiff with an "Individual Performance Program" that contained a summary of work responsibilities and tasks that DCJS Supervisor Amado expected plaintiff to perform in the Office of Finance. *Id*. ¶ 13.

Frantti returned a copy of this form to DCJS Supervisor Amado the next day, along with a series of typed comments that indicated plaintiff's belief that his assigned tasks did "not match the classified criteria of an Associate Budget Examiner." Ex. A to Amado Decl., Dkt. No. 42-43, p. 6. Among other things, plaintiff reiterated that he felt the BPAP portion of his Grade 31 exam was being administered improperly and that it remained improper for DCJS Supervisor Amado, a lower grade employee, to review him. Dep. Vol. 3 at 568:7-571:2, *see also* Dep. Vol. 1 at 78:8-22.

On July 14, 2015, an EHS physician evaluated Frantti and declared him fit to perform the essential duties of his position. Ex. C to Orcutt Decl. at p. 36. On July 20, 2015, plaintiff missed a full day of work even though he had e-mailed DCJS Supervisor Amado and

indicated he would be in by 10:00 a.m. that day.  Amado Decl. ¶ 16.  Plaintiff missed another full day of work on July 27, 2015.  *Id*. ¶ 18.  Plaintiff took a partial day of unscheduled leave on July 30, 2015.  *Id*. ¶ 19.  However, plaintiff took two more partial days of unscheduled leave on August 5 and 7, 2015.  *Id*. ¶¶ 20, 22.

On August 7, 2015, DCJS Supervisor Amado and DCJS Chief Analyst Rochester met with Frantti after he showed up to work ninety minutes late without any advance notice.  Amado Decl. ¶ 23.  At that meeting, they pointed out that plaintiff's excessive absences made it difficult to assign him meaningful work and to manage important work deadlines.  *Id*.  Plaintiff denies that this was the case.  Frantti Aff. ¶¶ 90-91.

On August 17, 2015, Frantti took more unscheduled leave, arriving at work at 2:00 p.m. that afternoon.  Amado Decl. ¶ 24.  Plaintiff took a pre-approved absence the next day, but took unscheduled, unapproved leave the day after that.  *Id*. ¶¶ 25-26.  This pattern continued throughout August.  *Id*. ¶¶ 27-33.

On August 31, 2015, DOB HR Officer Orcutt sent Frantti a letter directing him to appear at another Section 75 hearing.  Ex. C to Orcutt Decl. at p. 37.  According to DOB HR Officer Orcutt, this time the hearing was scheduled to address plaintiff's repeated violations of DCJS's call-in policy in June 2015.  Orcutt Decl. ¶ 57.

In the meantime, on September 1, 2015, Frantti heard back from the New York State Civil Service Commission regarding his complaint about the fairness of the BPAP.  Dep. Vol. 3 at 566:12-567:5.  In that response, the State Civil Service Commission concluded that plaintiff would not be competitively disadvantaged by DCJS Supervisor Amado's participation or by the fact that plaintiff remained assigned to DCJS.  *Id*. at 566:19-567:2.

On September 2, 2015, a Performance Evaluation Appeals Board (the "Appeals

Board") heard Frantti's administrative appeal from his "below expectations" performance evaluation. Labate Decl. ¶ 19. After taking testimony from plaintiff and DCJS Deputy Adams, the Appeals Board recommended denying plaintiff's appeal and upholding the "below expectations" performance evaluation. *Id*. Thereafter, DOB Budget Director Labate adopted the Appeals Board's recommendation. *Id*. ¶ 20.

On September 9, 2015, Frantti received a counseling memo from DCJS Supervisor Amado about his "excessive unscheduled absences." Dep. Vol. 3 at 635:3-23. According to this memo, plaintiff had taken "fourteen instances of unscheduled leave" since July 2, 2015. *Id*. at 636:1-6. Plaintiff contends that the one-day medical note requirement was reimposed on him as a result of this memo. Frantti Aff. ¶¶ 97-98. Plaintiff missed work the next day. Amado Decl. ¶ 39.

On September 14, 2015, DCJS HR Director Davis, DOB HR Officer Orcutt, and another HR official held the second Section 75 hearing. Orcutt Decl. ¶ 58. Plaintiff again contends that he was "terrified" he would be terminated as a result of this hearing. Frantti Aff. ¶ 79.

The parties resolved this second hearing by reaching a stipulation of settlement that included a two-day unpaid suspension and another Letter of Reprimand in Frantti's personnel file. Ex. C to Orcutt Decl. at pp. 45-47. Shortly thereafter, DOB HR Officer Orcutt sent plaintiff a letter again warning him that he should stop violating DCJS's time and attendance call-in policy. *Id*. at p. 48.

On September 17, 2015, Frantti submitted a second DHR complaint. Dep. Vol. 3 at 656:11-15; *see also* Ex. F to Ottaviano Decl., Dkt. No. 42-20. Plaintiff's second DHR complaint alleged retaliation by the DOB, DCJS, DOB Budget Director Labate, DOB HR

Officer Orcutt, and DCJS HR Director Davis arising from his claim that the DCJS time and attendance policies were being unfairly applied to him in the wake of the filing of his first DHR complaint. *Id*. at pp.12-15.

Around this time, Frantti had submitted to DCJS HR Director Davis a note excusing a group of "accumulated absences at the end of an extended absence," but claims they were "refused" because "the excuses had not been submitted on a daily basis within 24 hours of each day absent." Dep. Vol. 3 at 631:1-6; *see also* Frantti Aff. ¶ 99. Plaintiff contends that his pay was docked as a result, but admits that it was later repaid. Frantti Aff. ¶ 99.

On October 31, 2015, Frantti sent an e-mail to Laurie Lucier, a DOB employee, asking to explore the possibility of a work schedule that would permit plaintiff to start later in the morning, since the mornings were the times when his stomach was "most distressed." Frantti Aff. ¶ 102. Ms. Lucier responded to plaintiff and suggested that he "explore this on the internet." *Id*.

On November 9, 2015, DCJS Supervisor Amado sent Frantti a "clarification" memo explaining how the one-day note requirement applied to multiple-day absences. Ex. C to Amado Decl., Dkt. No. 42-45. According to this memo, "the required documentation must be submitted no later than close of business upon your first day back in the office." *Id*. Plaintiff denies there was ever any "misunderstanding" and instead insists that this was "just another device used by the Defendants designed to make [him] fail." Frantti Aff. ¶ 100.

In late September, through October and November, and into December of 2015, Frantti continued to miss significant amounts of time at work. Orcutt Decl. ¶ 60; Amado Decl. ¶¶ 39-60, 63-100. This pattern continued to worsen, with plaintiff missing work every day from November 16, 2015 through December 22, 2015. *Id*. Plaintiff provided medical

documentation for some, but not all, of these absences.  *Id*. ¶ 62.  Plaintiff returned to work on December 23, but the next day plaintiff had another unscheduled absence.  *Id*. ¶ 60.

Eventually, after going through "every test that [his doctors] could come up with," Frantti sought out mental help.  Dep. Vol. 1 at 216:12-21.  First, plaintiff met with Joyce Gary, a psychologist, through the State's Employee Assistance Program.  *Id*. at 214:15-218:5. After meeting with her "about ten times," she informed plaintiff that "she felt that what was happening to [him] was psychologically related."  *Id*. at 215:6-10, 217:13-14.  However, she was not licensed to prescribe plaintiff any psychotropic medicine.  *Id*. at 215:9-10.

### N.  Frantti Takes More Leave

In December of 2015, Frantti applied for a second period of short-term disability leave.  Dep. Vol. 2 at 513:19-514:2.  Plaintiff's leave was again approved by the State but his pay was again denied by his insurer.  Dep. Vol. 1 at 145:5-12; Dep. Vol. 2 at 514:15-18. After beginning this second short-term leave of absence in January of 2016, plaintiff would never return to work.  Dep. Vol. 3 at 590:1-11; Orcutt Decl. ¶ 63.

On January 26 and February 22, 2016, following an investigation, the DHR issued two determinations denying and dismissing Frantti's July 2, 2015 DHR complaint.  Ex. C to Ottaviano Decl., Dkt. No. 42-17 (January 26 notice); Ex. D to Ottaviano Decl., Dkt. No. 42-18 (February 22 notice).

Thereafter, the U.S. Equal Employment Opportunity Commission ("EEOC") sent to Frantti a "dismissal and notice of rights," explaining that it had adopted the negative findings of the DHR and indicating that plaintiff had ninety days in which to file suit.  Ex. E to Ottaviano Decl., Dkt. No. 42-19 (April 8 notice).

In March of 2016, still on leave from work and spurred on by his prior conversations

with psychologist Joyce Gary, Frantti began treating with Dr. Adrian Morris, a psychiatrist, and someone licensed to prescribe psychotropic medication.  Dep. Vol. 1 at 142:18-23.  Plaintiff started taking Prozac and Xanax under Dr. Morris's care.  *Id*. at 145:20-22.

On March 16, 2016, following a further investigation, the DHR issued a determination denying and dismissing Frantti's September 17 DHR complaint.  Ex. I to Ottaviano Decl., Dkt. No. 42-23; *see also* Pl.'s Vol. 3 at 657:6-8.  Thereafter, the EEOC sent plaintiff a second "dismissal and notice of rights."  Ex. J to Ottaviano Decl., Dkt. No. 42-24 (November 4 notice).

On April 20, 2016, DOB HR Officer Orcutt sent Frantti a letter stating that his second claim for short-term disability leave had been denied.  Ex. O to Orcutt Decl., Dkt. No. 42-67.  This letter informed plaintiff that unless he was fit to return to work at that time, he should resume submitting medical documentation "for each future day-to-day absence and notify [his] supervisor within two hours" in accordance with DCJS call-in policy.  *Id*.  Plaintiff did not comply with these requirements.  Orcutt Decl. ¶ 66.  However, plaintiff did send a letter signed by Dr. Fogel that indicated he planned to appeal the denial of benefits.  *Id*.

On April 26, 2016, DCJS HR Director Davis sent DOB HR Officer Orcutt a letter recommending that Frantti's 2016 salary increase be denied on account of his continued poor job performance.  Ex. P to Orcutt Decl., Dkt. No. 42-68.  In that letter, DCJS HR Director Davis noted that plaintiff had missed "months' worth of time," which "precluded his supervisors from giving him any substantial projects."  *Id*.  DOB HR Officer Orcutt forwarded this recommendation to the Budget Director, who again approved it.  Orcutt Decl. ¶ 67; *see also* Dep. Vol. 2 at 448:1-8.

On May 24, 2016, DOB received a letter from Dr. Fogel that indicated Frantti was

"unable to work at this time" and that his status would be re-evaluated on June 17, 2016. Ex. D to Orcutt Decl., Dkt. No. 42-56, p. 54. DOB accepted this as sufficient documentation to satisfy the DCJS time and attendance policy. Orcutt Decl. ¶ 68.

Dr. Fogel provided a second, substantially similar letter that indicated Frantti would be unable to work until July 1, 2016. Ex. D to Orcutt Decl. p. 55. According to DOB HR Officer Orcutt, plaintiff sent DOB a third letter from Dr. Fogel that indicated plaintiff could return to work on July 11, 2016. Orcutt Decl. ¶ 69.

### O. Frantti Resigns

However, on July 11, 2016, Frantti did not show up to work. Orcutt Decl. ¶ 70. Instead, plaintiff sent a letter to DOB HR Officer Orcutt informing her of his resignation. Ex. Q to Orcutt Decl., Dkt. No. 42-69; *see also* Pl.'s Vol. 1, 144:18-20. According to this letter, plaintiff enjoyed working at DOB but found his placement at DCJS caused a "documented negative impact on [his] physical and mental health." *Id*.

All told, Frantti was denied his yearly performance advance and general salary increases in 2014, 2015, and 2016. Pl.'s Vol. 2 at 448:1-8. During this same three-year period, plaintiff had missed 1,562.5 hours out of approximately 1,950 working hours (in 2014), 1,434.5 hours out of approximately 2,025 working hours (in 2015), and 525 hours out of 525 working hours (in 2016). Orcutt Decl. ¶ 72.

Stated differently, Frantti missed 173 full days and 75 partial ones out of a total of 251 working days in 2014. Adams Decl. ¶ 84. From January 1, 2015, through June 9, 2015, plaintiff missed 100% of work because of his first leave of absence. *Id*. ¶ 85.

After Frantti returned to work in mid-2015, he missed a few more days before being reassigned to the OPCA's Office of Finance. Adams Decl. ¶ 86. Thereafter, in the second

half of 2015, plaintiff missed 53 full days of work and took 17 partial days off before starting his second leave of absence.  Amado Decl. ¶ 130.

From January 1, 2016 through his resignation on July 11, 2016, Frantti missed every single day of work.  Amado Decl. ¶ 129.  Expressed differently, plaintiff missed work about 75% of the time he was assigned to the Office of Finance.  *Id*. ¶ 130.

Recently, Frantti's gastrointestinal symptoms have returned, seemingly as a result of the renewed psychological stress caused by this ongoing lawsuit.  Pl.'s Vol. 1 at 146:7-148.  By all accounts, then, plaintiff's persistent, recurrent physical symptoms turned out to be the result of an undiagnosed psychological condition.  *See* Frantti Aff. ¶ 6 n.2.

## III.  <u>LEGAL STANDARD</u>

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The movant bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim.  *See, e.g.*, *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).  If this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of

fact for trial. *Anderson*, 477 U.S. at 250.

Summary judgment is not appropriate if, after resolving all ambiguities and drawing all factual inferences in favor of the nonmoving party, a review of the record reveals sufficient evidence for a rational trier of fact to find in the non-movant's favor. *See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

## IV. __DISCUSSION__

Defendants argue that summary judgment is warranted on Frantti's remaining claims because the record evidence demonstrates that "plaintiff was a floundering employee whose job performance became increasingly unsatisfactory over time." Defs.' Mem., Dkt. No. 42-85, 3. According to defendants, plaintiff's mysterious physical symptoms were so frequently debilitating that "no reasonable accommodations [ ] would have allowed plaintiff to perform the essential aspects of his job." *Id*. at 3-4.

Further, defendants assert that Frantti was "uniquely difficult to manage as an employee, and that he knowingly, repeatedly, and flagrantly violated relevant time and attendance policies." Defs.' Mem. at 4. Notably, defendants point out that although plaintiff's actual condition turned out to be *psychological* and likely stress-related in nature, he resigned from State employment before ever informing defendants of that crucial distinction. *Id*.

Frantti responds that his own inability to determine the root cause of his gastrointestinal symptoms is not the *sine qua non* of a viable disability claim. *See* Pl.'s Opp'n, Dkt. No. 44-22, 7. Plaintiff concedes that his impairment "made him unable to show up for work with sufficient dependability to be given assignments consistent with his employment grade" but nevertheless insists that defendants should have let him try working from home anyway. *Id*. at 10-11.

Defendants reply by reiterating that they were never on notice of the underlying, psychological basis of Frantti's physical symptoms. Defs.' Reply, Dkt. No. 45, 5. According to defendants, what counts as a "reasonable accommodation" for an unknown, debilitating physical condition is totally different than a "reasonable accommodation" for a condition caused by environmental work stressors. *Id*.

In defendants' view, "there was no reason to believe that a transfer to another desk job in another office or agency, or change of supervisors, or different management methods, or less psychologically stressful assignments, etc. would have been an effective, reasonable accommodation for an apparently untreatable physical illness/disease that caused disabling nausea, diarrhea, pain and severe, debilitating fatigue" even though those kind of accommodations might well have been perfectly appropriate for a *known* psychiatric condition. Defs.' Reply at 5-6.

## A. Local Rule 7.1(a)(3)

Before getting to the merits of these arguments, though, an important procedural issue must be addressed. As noted *supra*, Frantti, although represented by counsel in this action, failed to properly oppose the statement of undisputed material facts submitted by defendants in accordance with Local Rule 7.1(a)(3). *See generally* Dkt. No. 44 (plaintiff's filings in opposition); *see also* Defs.' Reply at 3 (noting the procedural deficiency).

"The responding Statement of Material Facts is not a mere formality." *Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 441 (N.D.N.Y. 2013) (McAvoy, J.). To the contrary, this and other local rules governing summary judgment are "essential tools" intended to relieve the district court "of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties.'" *Carter v. Broome County*, 394 F. Supp. 3d 228, 238 (N.D.N.Y.

2019) (quoting *N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005)).

As relevant here, Local Rule 7.1(a)(3) imposes straightforward requirements on a party seeking to oppose summary judgment. It directs a non-movant to: (1) "file a response to the Statement of Material Facts" that (2) "mirror(s) the movant's Statement of Material Facts" by (3) "admitting and/or denying each of the movant's assertions in matching numbered paragraphs" with (4) "specific citation(s) to the record where the factual issue arises." N.D.N.Y.L.R. 7.1(a)(3). It also warns—in no uncertain terms—that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.* (emphasis omitted).

Frantti took a different tack. Instead of following this local rule and engaging with the voluminous materials produced in discovery in this action (such as his 800+ pages of deposition testimony, *see* Dep. Vols. 1-3, Dkt. Nos. 42-4 through 42-6), plaintiff's opposition relies almost exclusively on a separate affidavit sworn to on April 19, 2019, just a few days before the opposition to summary judgment came due on April 23. *See* Frantti Aff., Dkt. No. 44-1, ¶¶ 1-111.

Of course, it is not improper for a non-movant to submit an affidavit as part of the opposition to summary judgment, or to rely on an affidavit in drafting a proper, responsive statement of material facts in accordance with the local rules.[6] But Frantti's affidavit has

---

[6] Provided, of course, that the affidavit is not crafted solely for the purpose of manufacturing issues of fact for trial. *See, e.g., Brandon v. Kinter*, 938 F.3d 21, 33 n.9 (2d Cir. 2019) (observing general rule that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony" (citation omitted); *Palazza ex rel. Delmage v. Corio*, 232 F.3d 38, 43-44 (2d Cir. 2000) (explaining that any such concern can be alleviated with corroborating evidence).

improperly made certain assertions on mere "information and belief." *See, e.g.*, Frantti Aff. ¶¶ 1, 99. And even crediting the ones properly made on his own personal knowledge, plaintiff's haphazard approach to opposing defendants' summary judgment motion leaves many important facts uncontested. *Compare* Frantti Aff., *with* Defs.' Rule 7.1 Statement, Dkt. No. 42-1 ("Rule 7.1 Statement").

This affidavit also challenges a smattering of assertions made in certain declarations submitted by defendants in support of their properly submitted statement of material facts. *See, e.g.*, Frantti Aff. ¶ 91 (faulting DCJS Supervisor Amado's declaration for lacking a sufficient "level of detail"); *id*. ¶¶ 10, 107 (challenging the sufficiency of the individual defendants' responses to plaintiff's counsel's questioning about a hypothetical accommodation). However, "simply challenging the credibility of a declarant" is not the proper way for a non-movant to go about creating a genuine issue of material fact. *Estate of D.B. ex rel. Briggs v. Thousand Islands Cent. Sch. Dist.*, 327 F. Supp. 3d 477, 490 n.12 (N.D.N.Y. 2018) (Suddaby, J.) (collecting cases).

In addition this affidavit, Frantti submitted certain exhibits, including some time records, Exs. 44-2 through 44-6 and Ex. 44-20, and a few snippets of documentary evidence: a doctor's note post-dating his resignation from State employment, Ex. 44-7, a copy of his resume and some other materials associated with his promotion(s) and move over to DCJS, Exs. 44-8 through 44-12 and Exs. 44-14 and 15, a few e-mail exchanges, Ex. 44-13 and Exs. 44-17 through 20, and copy of some of DCJS's time and attendance policies, Ex. 44-16. But a review of these various exhibits reveal this material is mostly duplicative of documentation already present in defendants' properly supported summary judgment filing.

In short, Frantti's opposition adds little to the analysis in this case.  And because the relevant local rule on this precise issue could not be more clear, defendants' statement of material facts "will be accepted as true to the extent that the facts are supported by evidence in the record."  *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.); *see also Davis v. Cumberland Farms, Inc.*, 2013 WL 375477, at *4 (N.D.N.Y. Jan. 29, 2013) (Scullin, J.) (deeming admitted the properly supported factual assertions in movant's Local Rule 7.1(a)(3) statement where non-movant's submission "did not specifically controvert" them).

## B.  Disability Discrimination

Under Title I of the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  *Castro v. City of N.Y.*, 24 F. Supp. 3d 250, 259 (E.D.N.Y. 2014) (quoting 42 U.S.C. § 12112(a)).  "Like the ADA, the Rehabilitation Act prohibits disability-based discrimination, but it applies specifically to government agencies and other recipients of federal funds."  *Id*. at 260 (citation and internal quotation marks omitted).

Absent direct evidence[7], claims for employment discrimination under the ADA and the Rehabilitation Act are both analyzed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See, e.g.*, *Kho v. N.Y. & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 717 (S.D.N.Y. 2018); *Atencio v. U.S.*

---

[7]  *But see McMillan v. City of N.Y.*, 711 F.3d 120, 129 (2d Cir. 2013) ("When the parties agree that the employer complains of conduct that is the direct result of the employee's disability, however, there is no need to evaluated whether the employer's adverse employment action made in response to that conduct is pretextual.").

*Postal Serv.*, 198 F. Supp. 3d 340, 355 (S.D.N.Y. 2016).

As relevant here, "[t]he ADA and the Rehabilitation Act require employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual.'" *Cadoret v. Sikorsky Aircraft Corp.*, 323 F. Supp. 3d 319, 324 (D. Conn. 2018) (quoting *McBride v. BIC Consumer Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009)); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (noting that "disability discrimination" includes a failure to accommodate a plaintiff's known limitations); *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 251 (E.D.N.Y. 2015) (discussing ADA amendments, the limitations of "regarded as" claims, and noting that "[e]mployers do not need to reasonably accommodate individuals who do not have an actual disability").

"To establish a *prima facie* case of discrimination based on an employer's failure to accommodate a disability, under either the ADA or the Rehabilitation Act, a plaintiff must demonstrate that '(1) [the plaintiff] is a person with a disability under the meaning of [the statute in question]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *Natofsky v. City of N.Y.*, 921 F.3d 337, 352 (2d Cir. 2019) (quoting *McBride*, 583 F.3d at 97)).

A "reasonable accommodation" is a modification "to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable[s] an individual with a disability who is qualified to perform the functions of that position." *Atencio*, 198 F. Supp. 3d at 356 (quoting 29 C.F.R. § 1630.2(o)(1)(ii)).

"A reasonable accommodation can be achieved in a variety of ways, *see* 29 C.F.R. § 1630.2(o)(2), and 'employers are not required to provide a perfect accommodation

or the very accommodation most strongly preferred by the employee,' as long as the chosen accommodation is effective." *Atencio*, 198 F. Supp. 3d at 356 (quoting *Noll v. I.B.M. Corp.*, 787 F.3d 89, 95 (2d Cir. 2015)).

Importantly, however, "'[a] reasonable accommodation can never involve the elimination of an essential function of a job,' *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) or result in a promotion to a position for which the employee is unqualified, *McBride*, 583 F.3d at 98." *Atencio*, 198 F. Supp. 3d at 356.  Nor is an employer required to create a new position as an accommodation." *Id*. (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 187 (2d Cir. 2006)).

"If a plaintiff suggests plausible accommodations, the burden of proof shifts to the defendant to demonstrate that such accommodations would present undue hardships and would therefore be unreasonable." *Hernandez*, 100 F. Supp. 3d at 262 (quoting *McMillan v. City of N.Y.*, 711 F.3d 120, 128 (2d Cir. 2013)).  An "undue hardship" is "an action requiring significant difficulty or expense." *Id*. (quoting 42 U.S.C. § 12111(10(A)).

Upon review, Frantti's ADA and Rehabilitation Act claims fail under this body of governing law.  Even resolving the disputed facts in plaintiff's favor and viewing the record in the light most favorable to him, no reasonable jury could find in plaintiff's favor on his "failure to accommodate" theory of disability discrimination.

Indeed, Frantti's claim fails at virtually every step of the relevant analysis.  First off, "[t]he plaintiff bears the burden of production and persuasion on the issue of whether he is otherwise qualified to perform the essential functions of a job." *Pesce v. N.Y. City Police Dep't*, 159 F. Supp. 3d 448, 456-57 (S.D.N.Y. 2016).  The "essential functions" of a position "means the fundamental job duties of the employment position," but does not include "the

marginal functions of the position." *Atencio*, 198 F. Supp. 3d at 356 (citation omitted).

"In determining whether a particular function is essential, courts consider, among other things, '[t]he employer's judgment as to which functions are essential,' '[w]ritten job descriptions,' and '[t]he amount of time spent on the job performing the function.'" *Atencio*, 198 F. Supp. 3d at 356 (quoting 29 C.F.R. § 1630.2(n)(3)).

"A court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *Atencio*, 198 F. Supp. 3d at 356 (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 151 (2d Cir. 1998)). "But ultimately, the question whether a task constitutes an essential function depends on the totality of the circumstances." *Id.* (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004)).

Defendants' properly supported submissions establish that Frantti's various job assignments at DCJS required him to perform "involved analysis" on complex, collaborative projects that unfolded over long periods of time. Rule 7.1 Statement ¶¶ 52-54; *see also* Adams Decl. ¶ 87. Plaintiff's job assignments also required him to be "in the office and available, on a consistent basis, for assignments (many of which have relatively tight deadlines)," and to answer questions and communicate with other DCJS staff and outside agencies. Adams Decl. ¶ 87.

Nowhere in his affidavit or supporting materials does Frantti claim that one or more of these functions, including the need to be physically present in the office on a sustained and consistent basis to collaborate with other employees on various projects of an occasionally time-sensitive nature, were *not* essential to his assignment at DCJS. *Pesce*, 159 F. Supp. 3d at 456-57. Rather, plaintiff just states that he should have been allowed to work remotely

from home, and supports this claim by noting that his father, who worked for a different State agency fifteen years ago, worked "from home via computer" after an injury.[8]  Frantti Aff. ¶¶ 10, 107.

Frantti does insist that, on one occasion in October of 2015, he sent an e-mail to an HR official asking to explore the possibility of a modified work schedule and in response was directed to the relevant policies located on the internet.  Frantti Aff. ¶ 102.  It is true that the disability statutes contemplate that this kind of accommodation might be a possibility in appropriate circumstances.  *See, e.g., Doak v. Johnson*, 19 F. Supp. 3d 259, 275 (D.D.C. 2014) (citing 42 U.S.C. § 12111(9)(B)); *see also McMillan*, 711 F.3d at 126 (discussing possibility that arriving later in the day might be a reasonable accommodation).

But this is insufficient to defeat summary judgment in this case.  Importantly, Frantti failed to controvert defendants' factual assertion that plaintiff's regular, physical presence in the office during regular working hours was an "essential function" of his job assignment at DCJS.  And both before and after he made this request, plaintiff's presence at work remained sporadic and unpredictable.  Adams Decl. ¶ 87.  As a result, there was no indication that this particular accommodation was "an achievable reality" at the time.  *Doak*, 19 F. Supp. 3d at 277 (concluding same where plaintiff sought modified work schedule against background of repeated, unpredictable absences).

Second and perhaps even more importantly, Frantti has failed to controvert defendants' factual assertion that the combined effect of plaintiff's ongoing gastrointestinal

---

[8]  Even then, though, Frantti nowhere avers that he actually *asked* to work from home.  *Cf. Kho*, 344 F. Supp. 3d at 721 ("It is well-settled that an employer cannot be liable for failing to provide an accommodation that was never requested.").  Nor does he appear to claim that he actually *asked* for some kind of related accommodation that might facilitate working at his work station or desk.  *See, e.g.*, Dep. Vol. 2 at 268:21-269:1 (conceding he never requested a standing desk).

symptoms completely *disabled him from working*.  Defs.' Rule 7.1 Statement ¶¶ 24, 26 (emphasis added).

After all, defendants agree with Frantti's assertion that he made every effort to be present at work whenever he was not actively symptomatic.  *See, e.g.*, *id*. ¶¶ 34, 36.  In other words, the many, many instances in which plaintiff missed full or partial days of work were due to the extreme discomfort caused by his gastrointestinal symptoms.  Rule 7.1 Statement ¶¶ 27-28, 35.

During these periods Frantti "was generally lying in bed" and felt it was "difficult if not impossible to sit at a desk" or do office work of the type expected of him.  Rule 7.1 Statement ¶¶ 27-28, 35.  Plaintiff acknowledges in his own affidavit that he would need to take breaks, frequently run to the bathroom, and "sit, stand or recline as needed in ways not otherwise available (or appropriate) in an office setting" when his symptoms occurred.  Frantti Aff. ¶ 9.

Indeed, Frantti concedes in his own opposition memorandum that his ongoing physical impairment, whatever its true underlying nature, "made him unable to show up for work with sufficient dependability to be given assignments consistent with his employment grade."  Pl.'s Opp'n at 10-11.  It is difficult to see how a plaintiff who cannot complete assignments "consistent with his employment grade" is qualified to perform the "essential functions" of his work assignment.  *Cf*. *Hernandez*, 100 F. Supp. 3d at 261 ("While a reasonable accommodation may include adjustments such as the modification of physical facilities, work schedules or equipment or job restructuring, reasonable accommodation does not mean the elimination of any of the position's essential functions.").

And when Frantti actually discovered the psychological underpinnings of his physical

gastrointestinal symptoms, he voluntarily resigned from State employment rather than (1) return to work; (2) let his supervisors know he had discovered the true cause of his symptoms; and/or (3) try to pursue one or more workplace accommodations that might alleviate some or all of the apparent work-related stress or anxiety. Defs.' Rule 7.1 Statement ¶ 42.

Whether it is transmitted to the employer formally or informally, a defendant cannot be said to have failed to provide a reasonable accommodation if the plaintiff "fails to provide the information necessary to assess the request for an accommodation" in the first place. *Khalil v. Pratt Inst.*, 2019 WL 1052195, at *7 (E.D.N.Y. Feb. 13, 2019).

Thus, the Court agrees with defendants that "there was no reason to believe that a transfer to another desk job in another office or agency, or change of supervisors, or different management methods, or less psychologically stressful assignments, etc. would have been an effective, reasonable accommodation for an apparently untreatable physical illness/disease that caused disabling nausea, diarrhea, pain and severe, debilitating fatigue" even though those kind of accommodations might well have been perfectly appropriate and reasonable for an employee suffering a *known* psychiatric condition. Defs.' Reply at 5-6.

Frantti's repeated suggestion that he should have been somehow exempted from the DCJS time and attendance policies fares no better because it would not have been a "reasonable accommodation" under the circumstances of this case. Plaintiff certainly found aspects of the call-in policy to be onerous, inefficient, and unfairly burdensome to him and his doctor.

But there is no indication that Frantti's alleged disability actually rendered him incapable of complying with the policy. *See, e.g.*, *Brown v. The Pension Boards*, 488 F.

Supp. 2d 395, 406 (S.D.N.Y. 2007) ("The record indicates that [plaintiff] was capable of complying with the call-in policy despite his alleged disability . . . . "); *Jackson v. Nor Loch Manor Healthcare Facility*, 297 F. Supp. 2d 633, 636 (W.D.N.Y. 2004) ("Certainly, an employer is entitled to discharge an employee who fails to follow company rules and fails to appear for work without notification, even if the absences are attributable to a medical problem.").

To be clear, "[p]hysical presence at or by a specific time is not, as a matter of law, an essential function of all employment." *McMillan*, 711 F.3d at 126. However, the "reasonable accommodation" requirement found in the disability statutes does not obligate an employer to "develop a schedule whereby an employee works only when [his] illness permits." *Rinaldi v. Quality King Distribs., Inc.*, 29 F. Supp. 3d 218, 228 (E.D.N.Y. 2014).

Indeed, courts elsewhere have repeatedly concluded that "an erratic and unpredictable accommodation, such as an open-ended 'work whenever you want schedule' is unreasonable as a matter of law." *Doak*, 19 F. Supp. 3d at 276; *see also Fisher v. Vizioncore, Inc.*, 429 F. App'x 616, 616 (7th Cir. 2011) (non-precedential disposition) (noting that "an open-ended schedule with the privilege to miss workdays frequently and without notice" is unreasonable as a matter of law).

To that end, courts in this Circuit "have specifically noted that '[t]he ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability.'" *Lewis v. N.Y. City Police Dep't*, 908 F. Supp. 2d 313, 327 (E.D.N.Y. 2012) (citation omitted); *see also Rinaldi*, 29 F. Supp. 3d at 227 ("[Plaintiff] has not demonstrated that she could perform an 'essential function' of her employment, namely 'showing up for work.'"); *Pierce v. Highland Falls-Fort Montgomery Sch. Dist.*, 2011 WL

4526520, at *5 (S.D.N.Y. Sept. 28, 2011) ("Attendance is an essential function of employment.").

Frantti repeatedly suggests that defendants treated him unfairly under the DCJS time and attendance policies, placed him under "more restrictive requirements" than other employees in an effort to force him to resign, and characterizes the one-day note policy as a "punishment." Frantti Aff. ¶¶ 106, 109; *see also* Dep. Vol. 3 at 653:4-654:19.

But Frantti acknowledges that he has no evidence to support these conclusory allegations. Plaintiff understood that DOB time and attendance policies were different than DCJS policies on these issues, Dep. Vol. 3 at 732:4-736:20, and he failed to contest defendants' assertion that DOB employees "on loan status" to DCJS were required to follow DCJS policies while on loan to the sister agency, Rule 7.1 Statement ¶ 56.

Frantti also concedes that the DCJS policies at issue, including the one-day note requirement, applied to all DCJS employees and admits that he is unaware of *any other* DCJS employees who were treated differently or more favorably under those policies. Dep. Vol. 3 at 696:11-697:4, 701:14-21, 737:17-738:6; *see also* Rule 7.1 Statement ¶¶ 57-74. Simply put, plaintiff can point to no evidence in support of an accusation that co-workers with similar attendance problems were treated more favorably under the policies.

In sum, given the "[g]iven the sporadic and unpredictable nature of [Frantti's] absences," it was "impossible for [the State] to know from one day to the next," whether plaintiff would report to work. *Rinaldi*, 29 F. Supp. 3d at 228 (citation omitted). The State was not obligated to provide plaintiff an ongoing exemption of indefinite length from the time and attendance policies that were applicable to his fellow employees. *Cf. Jarrell v. Hosp. for Special Care*, 626 F. App'x 308, 311 (2d Cir. 2015) (summary order). Accordingly, no

reasonable juror could conclude that defendants violated the ADA or the Rehabilitation Act by failing to accommodate plaintiff's disability.

### C. Retaliation

"It is unlawful under the ADA (and consequently the Rehabilitation Act) for an employer to 'coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed . . . any right granted or protected by this chapter." *Atencio*, 198 F. Supp. 3d at 361. "Claims for retaliation [under the ADA and the Rehabilitation Act] are analyzed under the same burden-shifting framework established for Title VII cases." *Id.* (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).

"[T]he elements of a retaliation claim under ether [the Rehabilitation Act] or the ADA are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky*, 921 F.3d at 353 (quoting *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002)).

"A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Natofsky*, 921 F.3d at 353 (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 319 (2d Cir. 2015)).

"Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the

defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Atencio*, 198 F. Supp. 3d at 361-62 (quoting *Treglia*, 313 F.3d at 721).

Notably, certain aspects of retaliation claims are analyzed differently than claims for discrimination. First, "a plaintiff pursuing a retaliation claim need not prove that he or she was actually 'disabled' within the meaning of the ADA." *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 352 (E.D.N.Y. 2014).

Second, the concept of what constitutes an "adverse employment action" sweeps more broadly in the retaliation context. *See Atencio*, 198 F. Supp. 3d at 362 ("In the context of a retaliation claim, an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." (citation and internal quotation marks omitted)).

Third, a plaintiff's complaint can be formal or informal, and in fact the underlying conduct about which the plaintiff complains need not actually be unlawful so long as plaintiff possessed a good faith, reasonable belief that the challenged action violated the law. *See, e.g.*, *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 439 (E.D.N.Y. 2015).

Even in light of these relaxed standards, Frantti cannot establish a viable retaliation claim on this factual record. At the outset, plaintiff's opposition memorandum does not make an explicit argument against the dismissal of his retaliation claims and they can therefore be deemed abandoned. *See, e.g.*, *Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y.

2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

Even assuming otherwise, neither the criticism of Frantti's work performance (reflected in the lackluster employee evaluations) nor the ongoing "excessive scrutiny" applied by his supervisors (in continuing to apply the DCJS time and attendance policies against him) constitute a sufficient "adverse action" in the context of a disability retaliation claim. *See, e.g.*, *Volpe v. N.Y. City Dep't of Educ.*, 195 F. Supp. 3d 582, 597 (S.D.N.Y. 2016); *see also Natofsky*, 921 F.3d at 353-54 ("[A]ppealing a negative performance review is not a protected activity that can give rise to a retaliation claim.").

And the mere fact that DCJS continued to treat Frantti in a consistent way before *and* after he made complaints, *e.g.*, the May 2015 letter to Budget Director Labate or his subsequent DHR filings, is insufficient to conclude otherwise. *Cf. Porter v. Potter*, 366 F. App'x 195, 197 (2d Cir. 2010) (summary order) (holding in Title VII retaliation context that "[a]dverse employment actions that are part of an 'extensive period of progressive discipline' that begins prior to any protected activity on the plaintiff's part cannot give rise to an inference of retaliation").

The same is true of defendants' decision to withhold Frantti's yearly salary increases. "[A] continuous attendance issue is a legitimate reason for withholding an employment benefit." *Hannah P. v. Coats*, 916 F.3d 327, 343 (4th Cir. 2019).

As other courts have repeatedly noted, anti-discrimination statutes, like the ADA and the Rehabilitation Act, "do[ ] not require an employer to simply ignore an employee's blatant and persistent misconduct, even where that behavior is potentially tied to a medical

condition." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 305 (4th Cir. 2016); *see also Doak v. Johnson*, 798 F.3d 1096, 1107 (D.C. Cir. 2015) (rejecting plaintiff's claim of pretext where defendant asserted termination based on "her inability to maintain a regular schedule and presence in the workplace, and her frequent and unpredictable absences without leave"). Accordingly, summary judgment will be granted on this claim.

## D. <u>Equal Protection</u>

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This constitutional provision is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

"There are a number of common methods for pleading an equal protection claim." *Kisembo v. N.Y.S. Office of Children & Family Servs.*, 285 F. Supp. 3d 509, 523 (N.D.N.Y. 2018). The one relevant in this case is a so-called "class of one," where a plaintiff contends the defendant singled him out for mistreatment compared to other, similarly situated individuals. *See, e.g.*, *Ruggiero v. City of Cortland*, 2018 WL 5983505, at *15 (N.D.N.Y. Nov. 14, 2018) (discussing the mechanics of various Equal Protection theories).

Again, though, Frantti abandoned this claim when he failed to oppose defendants' arguments in support of its dismissal. *See, e.g.*, *Taylor*, 269 F. Supp. 2d at 75. Even assuming otherwise, this kind of claim is not cognizable in the public employment context. *See, e.g.*, *Chick v. Cty. of Suffolk*, 546 F. App'x 58, 60 (2d Cir. 2013) (summary order) (affirming dismissal of § 1983 claim where "district court correctly determined that disability is not a suspect classification under the Equal Protection Clause, and that a class of

one does not exist in the public employment context"); *Dotson v. City of Syracuse*, 2019 WL 2009076, at *11 (N.D.N.Y. May 7, 2019) (D'Agostino, J.) ("Indeed, the courts have uniformly held that disability discrimination claims cannot proceed under Section 1983 because there are specific statutes that provide for such relief."). Accordingly, summary judgment will be granted on this claim.

## V. **CONCLUSION**

The record demonstrates that Frantti enjoyed a great deal of success as a State employee at DOB and, for a time, at DCJS. However, the record also confirms that plaintiff consistently failed to follow DCJS time and attendance policies even as his supervisors tried to let him work through his mysterious gastrointestinal illness. In light of defendants' properly supported summary judgment motion and plaintiff's deficient response in opposition, no reasonable juror could find in plaintiff's favor on his remaining claims.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED; and

2. Frantti's amended complaint is DISMISSED.

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.


Dated:  October 29, 2019
        Utica, New York.

_____
United States District Judge